The next matter is number 16-1126, Jeffrey D'Agostino v. EV3, Inc. May it please the Court, I am Dan Miller representing the relator in this matter, Jeffrey D'Agostino. Your Honors, I would start with the Rule 12-B-6 ruling by Judge Stearns in the District Court. The plaintiff, my client, Jeffrey D'Agostino, pled four very well-established, long-recognized theories, both in this circuit and others. With respect to the product known as Onyx, he pled a fraudulent inducement claim and a medical necessity claim. With respect to the product known as Axiom, he pled a defective product claim and a medical necessity claim. In the briefing, obviously, are the citations to all of the authority that support those claims. The defendant doesn't contest those authorities, nor did the District Court, which is where it erred. Without being part of the briefing, part of the argument, the District Court, on its own, made a series of irrelevant observations about the role of the FDA and the role of the District Court in regulating medical devices. Let me ask you to start with your fraudulent inducement theory. Unless you establish that the FDA actually relied on what you point to as the misrepresentation, in the sense that but for that misrepresentation it would not have approved the product, then what's the causal link between the misrepresentation to the FDA and the payment of a claim by CMS based on a physician submitting a claim in accordance with the FDA-approved product? Judge, I'll take that question in reverse order. There's two pieces to it. CMS does not pay for products which are not FDA-approved. In other words, it's a precondition for CMS to pay for a product that FDA approval is. Sure, but this one was FDA-approved. Unless you prove that the FDA actually approved it in reliance on that misrepresentation and would not have otherwise proved it, I'm having trouble seeing what the causal link is between the misrepresentation made to the FDA and the payment of the claim. Judge, I think the word causal is where I think we need to talk. The standard under the False Claims Act for materiality is not causation or preponderance of the evidence or anything along that, a prima facie case. It's whether the misrepresentations were capable of influencing the agency's decision making. And it's very clear from the evidence cited in the complaint ad nauseum that the FDA was very concerned about the approval of Onyx. It was a precondition of the FDA Neurological Devices Panel that all physicians be trained. There's page after page of concern about safety, training, and that the product not be used off-label. All along, the company was making representations about safety, training, and FDA approval. Let me say why I think that's a problem. It's not a representation to the payer. It's a representation to someone else who then issues a certification that the payer does something. Under your theory, couldn't a jury come back and say these products should not have been sold to the government? That's your theory. And yet the FDA at the same time is saying we think these products should be sold and are medically appropriate products that balance the risks against them. And yet the product would have to be taken off the market because six jurors disagreed with the FDA. That's the scenario that I don't see how you get around here. I would respectfully disagree, Your Honor. I think what you're saying is that if the FDA process was lawfully followed and the FDA approved the device and CMS therefore decided to reimburse for it, could a jury sitting in a different courtroom that has a jury box say that, oh, we disagree with the FDA's decision? That's not what we're saying. No, no, no. I'm not saying that. I'm saying right here, suppose we move you and you're at trial tomorrow and the jury's sitting over there. The FDA is still approved Onyx as I understand it. It's an FDA approved product. Yes, Judge. Okay. And yet you would be asking the jury to rule that any sale of that to the government is a false claim. Yes, I would. So that would mean if the jury ruled that, then that would take the product off the market because any further sales would result in further liability that would exceed any profits. I don't think it's a jury decision. It's a CMS decision, at least as I'm understanding Your Honor's question. If CMS knew that the FDA approval was procured by fraud, it would not have paid the claims because it is a precondition to CMS that there be a proper lawfully followed FDA process. You just came back to the original point. You said if it was procured by fraud, in other words, it was actually procured by fraud, as opposed to someone made a misrepresentation which was capable of influencing the FDA but in fact didn't issue the FDA and the FDA, knowing all the facts, still wants that product out there, you would be having a jury take the product off the market and deprive everyone of an FDA approval. No, I would respectfully suggest that it would go differently. The FDA approval that was procured by fraud would be rescinded, and then the applicant could reapply. Who would rescind it? Presumably CMS would say that we do not recognize this product as being reimbursable because the approval was procured by fraud and the approval was a precondition of payment. Okay, so CMS has the power then to say that a product the FDA has approved, even when the FDA knows of all the facts and has not rescinded, the CMS can say it's not an FDA approved product. No, it can say that we will not pay for it. And so, for example, from turning to the second theory, medical necessity, in every instance when that theory doesn't rely on fraud on the FDA, it's a second condition that CMS says, all right, even if you have an FDA approved product, it also has to be medically necessary for this individual patient. And if on an individual basis the plaintiff can prove that the product wasn't medically necessary, then CMS will not pay for it. And there's regulation specifically saying that you need to certify the physician and the hospital need to certify to the medical necessity. And if they do and that's proven to be, that certification is proven to be caused by illegal behavior, which is what we allege here, then that's a false claim. So that is what I would turn to now with the time remaining is the Rule 9B argument. Should the court revert? With respect to the Rule 9 argument, I noticed that probably because it's so recent, you haven't taken account of our decision in Kelly against Novartis. Doesn't that cut against you on the Rule 9? Judge, I am not familiar with that case. It must have happened after the briefing. It was. It was decided in June. It was decided a few months ago. But I suggest that it, I don't expect you to argue it if you haven't read it, but I think it works very strongly against you on your 9F arguments. I would only mention that if Kelly is not a case that deals with complete falsity, then it effectively has, it does not go to the core of what we are alleging here. All of this court's precedents with respect to 9B have dealt with cases that involve a subset of false claims. Kickback cases, off-label marketing cases, and so forth. This case is different. The incident case before the court. And this court has not ruled either in G and, to my knowledge, in Kelly, that the complete falsity theory has been rejected as a method of proving specificity under Rule 9B. I think you're claiming that even putting to one side the fraudulent inducement theory, you would still have a claim because some physicians are not trained and yet are using the product and submitting claims for reimbursement, notwithstanding their lack of training. Yes, sir. Yes, Your Honor. It's very common in False Claims Act cases for there to be a battle, a quote-unquote battle of the experts. The plaintiff's expert or the government's expert, if the government intervenes, says that particular procedure or product was medically unnecessary. If that's a valid theory, if so and that's a valid theory, how do we know whether a physician was trained without knowing who the physician is? Well, we did name physicians in the complaint that were not trained. But you named physicians who were not trained by the defendant. You did not name physicians who were not trained at all. And the FDA label doesn't seem to require training by the defendant. I would respectfully suggest that the gravamen of the FDA label very much does require that. Well, the words don't say it, do they? Well, Judge, I think they do. What words do you point us to in the FDA label that require that any physician be trained by the defendant? The label specifically says that any physician that uses this product without training is putting the patient's life at risk. Without training. And it says contact your MTI representative for training materials. It's specifically in the label, MTI being the manufacturer of the product. So you're saying if FDA, if the defendant trains the head physician at a unit and he then perfectly trains everyone else and they use the product perfectly with great degree of skill and precision, that would be a false claim? No, I don't think I would say that. Okay, then if that's not a false claim, don't we need to know whether that person was in fact trained by someone else or not and used it with a great degree of precision since that's not a false claim but the other ones are? I'm not sure I quite follow that question, Your Honor. I lost the thread a little bit. Hearing no further questions, thank you, Your Honor. May it please the Court, on behalf of the United States as amicus, the government is here to address two issues relating to the district court's broad 12B6 ruling. First, the district court erred in holding that alternative administrative remedies and agency decision-making foreclose liability under the False Claims Act. And second, we'd like to clarify that fraud and inducement is a viable theory of liability in appropriate circumstances. With respect to the first issue, as the Eighth Circuit held in Oman, alternative administrative remedies do not foreclose liability. The False Claims Act excludes actions based on certain types of claims, such as IRS claims, and Congress did not create the broad exception that the district court articulated here. In addition, there's nothing to the notion that the False Claims Act forecloses liability whenever a claim implicates agency decision-making in some way. That would foreclose a whole host of False Claims Act cases, many of which involve agency decisions in some way, such as whether a defendant is eligible to participate in a program, whether to award a government contract, or the basic decision of whether to pay a claim. On fraudulent inducement theory, this is an important theory of liability, and the facts of this case show why. In a fraudulent scheme involving medical devices, FDA approval is the gateway to accessing the market and the key to accessing government programs. So while a defendant not only causes fraudulent claims by committing fraud on FDA, there's no reason not to impose liability if the statutory requirements are met. The theory is based on... So what does government say a plaintiff has to allege to state such a claim? Under this theory, a plaintiff needs to allege that, but for the fraud, FDA would have approved the device and... You mean FDA would not have approved the device? I'm sorry. FDA would not have approved the device. So you've established a causal link. Correct. We do conceive of it a little differently, Judge Kayada. As you noted, that causal link is whether FDA would have approved it, and then the materiality inquiry looks to the effect of the fraud in that first phase of the scheme, the fraudulently induced FDA approval on the payment. So in a real-world situation like we would have here eventually, where the FDA has been fully informed of the allegations and the FDA does not withdraw product approval, would you anticipate six jurors sitting over there in a box one floor down from here could say, no, the FDA would not have approved this, but for? I think the best evidence will be what FDA has done in this case or similar cases, but two points I'd like to make is that if the device is still on the market, especially at the outset of a False Claims Act suit, FDA could have just been advised of the issue and could be still investigating the matter. And in addition, there are many times when FDA will consult with the defendant and the defendant voluntarily recalls the device. But if neither of those have happened, would it? It would be unlikely. We think this form of liability is going to be fairly rare, that it's so serious that FDA would have done this, but it's important that the theory is preserved in situations such as a manufacturer of a defective device wants to market a product to elderly patients, 90% or more of whom are Medicare recipients, and the way to go about this fraud would be to defraud the FDA, get it on the market. The defendant may intentionally and knowingly seek to affect government payments, and that's going to be a situation where the district court's reasoning would foreclose liability. But you see, there's another possibility, and that's what's creating the problem. What if the defendant legitimately believes that it has made no fraudulent inducement, right? And the FDA hasn't acted, simply hasn't acted, hasn't acted to rescind its approval, done anything else. We then have the situation that Judge Gatter has expressed some trepidation about, where despite the fact that FDA approval is out there, under your scenario a jury may say that that approval was fraudulently induced, whereas the FDA hasn't said that at all. The constraints on this theory are still the traditional statutory elements of materiality, scienter, and causation. So a defendant would need to know that its conduct is fraudulent and have to know the falsity, and it would also have to have the scienter requirement with respect to the materiality of FDA's approval. But Judge Sellier's question is positing, it's a real world question, where the facts are ambiguous, okay, on whether it's material and whether the FDA in fact relied on it at all and whether there's scienter. So all those facts are ambiguous. In a normal setting without this inducement theory, we would usually say ambiguous facts that could go each way on all the elements of an FCA claim goes to the jury. Here, though, if we were to do that, what we would be saying is that even though the FDA in fact determined that it has no problem with what was said with it and it thinks this is an important drug to be on the market and therefore it takes no action to remove it, that a jury could disagree with the FDA's scientists and effectively remove a product from commerce in the United States. And I don't see the government as advocating for that because I read your brief as very carefully saying that the FDA used the word actually relied on it, which avoids my scenario. Yes, Your Honor, precisely. Thank you. Before you step down, I take it that in an ideal world, that whether or not we think we have to reach this issue of fraudulent inducement, that the government would like us to say something about it if we think that the district court got it wrong. We'd like this court to articulate that this is a viable theory, that a claim can be false or fraudulent based on an initial fraud and in this situation where a defendant induces FDA to approve a device through fraud, that liability is possible if all of the False Claims Act elements are satisfied. Thank you. May it please the Court. Joshua Levy on behalf of defendants EB3 and MTI. Your Honor, this matter is back before this court for the second time after the plaintiff, the relator, said five opportunities to plead a viable complaint. And it's set forth in detail in Judge Stern's opinion down below. The proposed Fourth Amendment complaint will be a futile exercise. I'll let you get to your argument, but before I lose track of what's just been talked about. So if we wanted to accept the government's invitation or request, is there a way to do that in this case that is satisfactory to you? I guess it depends on the invitation, Your Honor. I don't think the court needs to reach the issue whether there is a viable fraudulent inducement theory under the False Claims Act to decide this case. The government said it at the podium. They said it in the brief. They said it in GE when they filed an amicus there. Very rare circumstances where this might be viable. This is not the case for that. For the very reasons that Judge Cayetano was pointing out, I disagree with Mr. Miller that this report was engaged in irrelevant observations. I think he was going to the heart of whether a plausible claim had been submitted here, pled here for fraudulent inducement, where the FDA has never taken action with respect to Onyx and taken off the market or done anything to withdraw the product. It's being used today in hospitals all around the country. So would the complaint have to allege that it has been taken off the market by the FDA? I think to define the rare circumstances where this complaint may be viable, I think it's beyond the scope of this case. But at the minute, Your Honor, I think you'd have to have a situation where the FDA took action to address the claim that a product had been on the market and that approval was procured by fraud. The FDA has known about this matter for five, six years at this point. It's taken no action. It hasn't called the manufacturer to talk about a recall at all. None of that's in the record. None of that's pled in the proceedings. And that's what I think Judge Strunk was getting at, was the complaint here essentially asked the judge and ultimately the jury to get in the shoes of the FDA. And we could have competing interpretations of whether a product should be on the market. A jury deciding that versus the FDA. And that's where the judge was going with his observations that this has been designated to the FDA to decide. It's a little odd. How does this work with the FCA procedures? Because you can envision a scenario in which the first discovery of the fraud is by the relator coming forward. He or she is the only one who knows about it and they're performing the public duty of announcing the fraud and they announce it with an FCA complaint. So at that time the FDA may not even know of the fraud, so it would be kind of hard to require that the complaint actually allege that the FDA has withdrawn it when they don't know of it yet. But then it goes under seal. The government knows about it. One would hope the Justice Department would turn over to the FDA and see if there's an issue. And then nine months, a year, five years go by. Do we apply then a different pleading standard to the amended complaint for failure to add an allegation of actual dependency on the felon? I think that the complaint should be read in light of the circumstances in 2014 when the Fourth Amendment complaint was proposed. And it does have those several years of government notice of the allegations. And he still cannot, because it's not true, put in his complaint any evidence or any allegations of FDA action in response to it. That would seem to me to be the bare minimum to allege fraudulent inducement. You would think the party that was fraudulently induced would respond. And if you look at the pleadings here of the alleged fraudulent inducement, he's relying on information the FDA published to claim that the FDA was defrauded. If you go to that Enterix product, Your Honors, that's the product that's made from similar compounds, manufactured by a different company for a different medical condition. The theory in the complaint is that the FDA was defrauded because MTI didn't tell the FDA about safety problems with Enterix. What does he rely on for that? He's got an FDA notice from 2004 about safety problems with Enterix. So here we have this crazy situation where someone MTIs defrauding the FDA by not telling the FDA about things that the FDA has published. So whatever the rare circumstances are that the government is trying to protect from the programmatic interest, I understand why they're doing it. This is not the case. And what's been teed up for this court, you've got a plausibly alleged fraudulent inducement case. This case does not stand on these facts. And that's what Judge Stearns was getting at in that reasoning, Your Honor. Let me turn, if I may, to the 9B arguments. I think they're an equally viable avenue for this court. Are you familiar with the Kelly case? I am familiar with the Kelly case, Your Honor. And I think in Kelly v. Novartis, this court was affirming its approach to 9B that is taken in the Gee case and the Duxbury case all along, that in order to plead a case that satisfies Rule 9B, you need to meet that minimum floor that Duxbury set up. And that's one of the main problems with this complaint here, is that the relator here has fallen far short of the Duxbury minimum standard. There's actually two 9B issues with this complaint. One is the lack of any specific claims that are pled. And second is the lack of specificity or particularity with respect to the actual fraud claims. I'd like to address both of those. Your Honor, what happened in the Gee case, I think, is quite central to the issues in this case. What happened in Gee was it was a claim that the relator made that the company was not filing its adverse event reports on time. Problems that were experienced with, in that case, a drug in the field. And had the FDA known about all the safety problems, it would have withdrawn its approval for the product. Very similar to what we have the allegation here. And the First Circuit said, we reject the approach of total falsity there. We reject the approach that if you just plead misconduct with particularity, which the court accepted the district court's opinion there that that had been pled, that therefore all the claims are false. Gee said you still need to meet the Duxbury standard. And Judge Sellier, that's what, in the Kelly case, went right back to that about the Novartis drug. You need to plead details about at least some false claims. Why, if you accept plaintiff's fraudulent inducement theory, and suppose the facts here is that after this complaint was filed, the FDA said, oh, my God, we've been defrauded and rescinded its approval of the product. And says it never would have approved it but for that. Don't we know that every single claim filed by any physician anywhere on that would be a false claim? Your Honor, if you had those facts, you would have a situation where this court would be asked, is there a narrow exception to the plea requirements this court has said over and over again in false claims act cases? And in that situation, I still think that the duty would be unrelated to plead a viable complaint. Why? What does it add if we know that every single one is false? If we accept the fraudulent inducement claim here, doesn't it eliminate any of the benefits of requiring that you find a couple of claims as long as you can allege that there were tens of thousands of them and by definition every single one is false? Well, Your Honor, that would certainly address one purpose of 9B, which is putting the defendants on notice as to where the actual fraud occurred. But there's other purposes behind 9B this court has recognized. One is you don't have parties who are injured like you have in a typical litigation. You have a party who's bringing a case on behalf of the United States and as a way to increase the requirements in those kind of cases and discourage parasitic lawsuits, you have the higher requirements of 9B. You also, Your Honor, have the 9B requirements of particularity with respect to the fraud alleged. So you have to plead that fraudulent inducement with particularity in order to satisfy Rule 9B. You have to show alleged circumstances and facts that show that the speakers at the time were engaged in fraud. That's another major problem with this complaint. Put aside the claims issue, which doesn't meet the Duxbury Standard by a long shot. The relator has not alleged that the speakers in 2003, at the time of this whole approval process, that he doesn't even allege that they knew what they were saying was false. That's basic First Circuit law from Hutchinson. In order to allege fraud, you need to show that the speaker knew what they were saying was false, not what they said was incorrect. And so you still have that particularity requirement, Judge Pallietta, around a fraudulent inducement theory, which this defendant has failed to satisfy. And just to hit it on 9B, in response to Mr. Miller, what you have in this case is 17 hospitals in the name and just their aggregate purchases. You don't have the dates of any claims. You don't have the amounts of any claims. You don't have the government programs to which the claims were submitted. And those are things that the floor in Duxbury said you had to have. In this complaint, and we submit the fraudulent inducement case, it's not pled plausibly. This complaint does not meet those bare minimum standards of Duxbury. And on the untrained doctors, which we got into a moment ago, Judge Pallietta, you raised the question we put out in our briefs. There's no allegation with respect to the two physicians in the complaint. There's only two physicians in the complaint that he alleges were not trained by EV3. He does not allege that those physicians were completely untrained. He submits a statement by Dr. Pryor, Mass General. In Dr. Pryor's statement, he acknowledges he provided training to other doctors. There are multiple ways to be trained on a product without necessarily going through a company training program. The complaint has to be plausible on its face. And the reading of the label that it requires company training strains the words of the label. It doesn't say that. So there's multiple ways a surgeon can be trained. And in this case, on those two untrained doctors, he doesn't allege that they weren't trained at all. And then he has the other 90 problems with those doctors. And he doesn't identify any procedures they performed that were submitted to the federal government. He doesn't identify the amounts of any claims, the dates of any claims, and the other minimal Duxbury standards that were required. Your Honor, I also would point out with respect to the Axiom claims, that we believe they also suffer from a Rule 12 deficiency. This is the coil that is fed through the body and detached to occlude an aneurysm. Under Rule 12 standard, what the plaintiff is alleging is the fact that this is a defective product. And all claims for Axiom are defective. So again, another swing for the fences to avoid the 90 requirements that the court has articulated. Well, the problem with the Axiom claims is there's nothing in the complaint by which this court can assess the failure rate of these devices. All he does is allege 13 instances where the device didn't work. In almost every one of those cases, the procedure was completed with another device. The government got what it paid for, which is an occluded blood vessel. They're not paying for the device on a per-device basis. As alleged in the complaint, they're reimbursed on a DRG or procedure-type basis. So the government gets what it paid for. And there's no information in the complaint by which this court can determine whether 10 percent of the Axiom devices failed, 100 percent, or 0.1 percent or even less. And that is, I think, what Judge Stearns down below found to be under Rule 12. There's not a plausible articulation of the theory by which the Axiom claims have also been pled with plausibility. The other point I'd make on that is the amount of the claims here really matters. It's not just hanging your hat on some lords in Duxbury. What the defendant, excuse me, what the relator provides in this complaint is how much hospitals paid for the product. That really has nothing to do with how much hospitals would have received in reimbursement. It's apples and oranges in terms of the aggregate purchases of the product and the reimbursement received to the government. That's why those 9B standards are so important. I'd lastly like to hit just one other point in Judge Stearns' decision on undue delay. Judge Stearns had five separate sections of his district court opinion. As the court knows, on a Rule 15 basis, it's a totality of circumstances when you're deciding whether a judge properly denied a motion to amend. And what Judge Stearns found is all the information that was in the Fourth Amendment complaint that was filed in 2014 was available to the defendant back in 2010. Judge Stearns was very careful not to predicate his dismissal of this case on the denial of the motion to amend on undue delay. He spoke about undue delay in terms very unflattering to the relator. And he spoke about prejudice, particularly with respect to the individual defendants. But his wording was very careful. He predicated this decision on futility. I think that's a fair reading, Your Honor. I think the heart of his opinion was certainly futility. He said, I'm inclined to agree, I think was his phrasing, on undue delay. But it wasn't clear that he was saying, in and of itself, I would find an undue delay. But in the totality of the circumstances analysis, which I think this Court has said that that's what it uses in applying the Rule 15 review, it's relevant to the judge's decision. You're not suggesting that we could find that these causes of action were other than futile and not susceptible to Rule 9b deficiencies and still affirm the dismissal? I'm not saying that the Court should affirm dismissal just on undue delay. It's a combination of all the arguments, Your Honor. Unless the Court has anything further, I respectfully submit on the briefs. Thank you. The next matter will be case number 152556, Nancy Bailey v. PricewaterhouseCoopers, LLP et al.